**Frances Broaddus CRUTCHFIELD and Henry Ruffin Broaddus, Plaintiffs,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS and County of Hanover, Virginia, Defendants.**

**No. 3:00CV525.**

United States District Court, E.D. Virginia, Richmond Division.

Nov. 2, 2001.

---

John Lyons Marshall, Jr., McSweeney & Crump, PC, William Brown Ellis, Ellis & Thorp, Richmond, VA, for Frances Broaddus Crutchfield and Henry Ruffin Broaddus.

M. Hannah Lauck, United States Attorney's Office, Richmond, VA, Gregory Scott Williams, U.S. Department of Justice, Environmental Defense, Environment and Natural Resources Div., Washington, DC, Katherine Deily Will, U.S. Army Corps of Engineers, Norfolk Division, Norfolk, VA, for United States Army Corps of Engineers.

Sterling Edwards Rives, III, Hanover County Attorney's Office, Hanover, VA, Robert Michael Tyler, McGuireWoods, LLP, Richmond, VA, William G. Broaddus, McGuireWoods, LLP, Richmond, VA, for County of Hanover, Virginia.

## MEMORANDUM OPINION

PAYNE, District Judge.

This action arises out of the actions taken by the County of Hanover, Virginia (the "County") and the United States Army Corps of Engineers (the "Corps") in respect of the County's attempts to meet its growing wastewater treatment needs. Under the circumstances outlined fully in a Memorandum Opinion issued on August 14, 2001 (the "August 14 Opinion"), the County planned, and began construction of, a wastewater treatment project, several aspects of which required authorization (in the form of "verifications") by the Corps. For the reasons set forth in the August 14 Opinion, the verifications given by the Corps were set aside as arbitrary, capri-

cious, and not in accordance with law.[1] *See Crutchfield v. United States Army Corps of Engineers,* 154 F.Supp.2d 878, 906 (E.D.Va.2001). The matter was remanded to the Corps so that it could consider "whether the entire wastewater treatment system ... [is] a 'major federal action,' and if so, then to fulfill the 'requirements of NEPA and its implementing regulations.'" *Id.* at 904–05.

The parties were directed to confer respecting, and to brief, the issue whether injunctive relief was appropriate to foreclose the County from further construction of any aspect of the wastewater treatment project while the Corps complied with the CWA, NEPA, and the NHPA. An evidentiary hearing on the issue of injunctive relief was held on October 3, 2001.

## BACKGROUND

The August 14 Opinion sets forth the historical background respecting the County's attempt to satisfy its wastewater treatment needs. It describes in detail the full course of the administrative process and the litigation that constitutes the framework within which the issue of injunctive relief arises. The August 14 Opinion, therefore, is incorporated here in the interest of brevity. Nonetheless, it is useful briefly to outline the facts that are most salient to the assessment of the request for injunctive relief.

Many years ago, the County recognized its growing wastewater treatment needs and began to plan the project at issue here. Those plans required construction of a project consisting of several components (a wastewater treatment plant (the "WWTP"), an interceptor pipeline (the "interceptor"), a force main, and an outfall/diffuser) that, together, would reduce the County's dependency on surrounding jurisdictions for wastewater treatment.[2] The construction and operation of the wastewater treatment project are integral to the County's ability to meet its goals under its "Comprehensive Plan," the purpose of which is to help the County manage population growth and expansion in an orderly manner. Pursuant to the Comprehensive Plan, growth and the public resources necessary to sustain that growth

---

1. The August 14 Opinion held that, in addition to acting in violation of § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.,* the Corps' decision-making process violated (1) the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.;* (2) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.;* and (3) the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*

2. At the present time, the County meets its demand for wastewater treatment capacity through a contractual arrangement with neighboring Henrico County, Virginia ("Henrico"). That contract limits the amount of wastewater that the County may divert into Henrico's treatment facilities to 5.4 million gallons per day. The County measures the amount of wastewater being diverted under the contract by calculating a 90–day rolling average. For at least one three month period in 1998, the County diverted approximately 4.5 million gallons per day (as measured by the peak rolling average experienced during that time period) pursuant to its contract with Henrico. This 4.5 million gallons figure appears to be the highest peak rolling average that the County has experienced under the contract. In 1999, this figure decreased to approximately 3.62 million gallons per day. The evidence is that, in 2000, the peak rolling average increased from the 1999 figure and, as of the October 3 hearing, the most recent peak rolling average was approximately 3.88 million gallons of wastewater per day. The evidence also indicates that fluctuations in the amount of capacity used under the contract with Henrico depends, in part, on weather patterns. However, since 1998, the average of the peaks that have been measured is 4 million gallons of wastewater per day, or approximately 74% of the contracted capacity. This means that, since 1998, 26% of the contracted capacity has remained unused.

are systematically directed into the "Suburban Service Area" in order to preserve the rural character of the remainder of the County.[3]

Because construction on the proposed project implicated several federal environmental statutes and regulations, the County was required to secure appropriate permits from the federal government (in this case, from the Corps). In particular, the Corps was called upon to decide whether and what type of permit could issue, pursuant to the CWA and related regulations,[4] to authorize the dredging and destruction of certain wetlands existing on land committed to the project. The Corps' permitting decisions involved (1) making certain evaluations under the CWA and other environmental laws and (2) deciding whether to require certain kinds of permits which, in turn, gave rise to the obligation to conduct additional evaluations pursuant to NEPA and NHPA.

On August 8, 2000, Plaintiffs filed a Complaint challenging the Corps' decision verifying that, under three Nationwide Permits ("NWPs"), the County could proceed with construction of several components of the project. Plaintiffs alleged that the Corps had violated applicable provisions of the CWA, NEPA, and NHPA. Plaintiffs sought a declaration that the Corps' verification of NWPs was contrary to law, pursuant to the APA, 5 U.S.C. §§ 551 *et seq.*, as well as injunctive relief to stop construction of the project until there was compliance with the applicable statutes.

The August 14 Opinion discusses in detail the specific decisions with which the Corps was faced when considering the County's permit application, the process by which the Corps came to its eventual decisions, and the parties' legal contentions respecting those decisions. The August 14 Opinion articulated, *inter alia*, that the Corps, at the urging of the County, had arrived at a "remarkably illogical conclusion" respecting whether the WWTP, the force main, and the outfall/diffuser had "independent utility" from the interceptor so that construction of those three components could proceed under authority of NWPs while the Corps considered whether to issue an individual permit for construction of the interceptor. *See Crutchfield,* 154 F.Supp.2d at 895–903; 33 C.F.R. § 330.6(d). The consequence of that decision was that the Corps did not conduct the requisite environmental assessments of the project that otherwise would have been required under NEPA and the NHPA. *See id.* at 904. The action of the Corps verifying NWPs for certain aspects of the project was set aside, and the matter was remanded to the Corps for further reconsideration in accordance with the August 14 Opinion.

## FACTS RESPECTING INJUNCTIVE RELIEF

The wetlands (the existence of which necessitates Corps review and approval of the project) that have been, and would be, affected by construction of the project are small in area.[5] Specifically, as set forth in

---

**3.** The Comprehensive Plan operates in phases of growth. The 1997–2002 phase of the plan is currently underway and the County anticipates that additional growth will occur in 2002, at which point its sewage needs will increase accordingly.

**4.** The specific statutory provisions and implementing regulations animating and involved in the permit requirement are as follows: (1)

33 U.S.C. §§ 1251(a) and 1344(e)(1); (2) 33 C.F.R. §§ 320, *et seq.;* (3) 42 U.S.C. § 4332(C); (4) 40 C.F.R. § 1508.27; (5) 16 U.S.C. § 470f; (6) 33 C.F.R. §§ 330.4 *et seq.;* and (7) 36 C.F.R. § 800 *et seq.*

**5.** 40 C.F.R. § 230.3 defines the term "wetlands" as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support,

the August 14 Opinion, at the outset of the project the County estimated the total area of affected wetlands to be as follows:

> [T]he WWTP will impact approximately 0.028 acre[ ] of wetlands for construction of the influent pump station [and 0.15 acre[ ] of wetlands for construction of the WWTP itself] and have no impact on waters; construction of the force main will not have a permanent impact on wetlands or waters, but will temporarily impact approximately 0.06 acre[ ] of wetlands and/or waters; the outfall 'will not have permanent impacts to wetlands or waters of the United States except for placement of the outfall diffuser on the river bottom.' ... And ... the TC interceptor involves 35 acres of wetlands ... of which 22 would be disturbed initially and 9 would be permanently cleared.

*Id.* at 884 (*citing* June 3, 1999 "Pre–Application Package"). Subsequently, the County modified the project so that the total area of affected wetlands is approximately 3.84 acres, made up of (1) a total of 0.16 acre of wetlands on the site of the proposed WWTP, 0.13 acre of which lies adjacent to an additional 0.02 acre of waters of the United States, and .01 acre of which is isolated and covered by an area of permanent fill and a large soil stockpile; (2) three wetlands crossings totaling approximately .06 acre that lie along the site of the proposed force main;[6] and (3) approximately 3.62 acres of wetlands along the route of the proposed interceptor.

Steven Herzog, the County's Senior Utility Engineer for the Department of Public Utilities, is responsible for overseeing all aspects of the design, permitting, and construction of the project. Mr. Herzog testified at the October 3 hearing that the total projected cost of all aspects of the project would be in the range of $35 to $39 million (hereinafter stated as $39 million), of which approximately $32 to $33 million (hereinafter stated as $33 million) were the expected cost of construction. The construction costs are allocated to the components of the project as follows: (1) the WWTP is expected to cost approximately $18 to $19 million (hereinafter stated as $19 million), of which approximately $5 to $5.5 million (hereinafter stated as $5.5 million) (about 29%) had been spent as of August 31, 2000;[7] (2) the force main is expected to cost approximately $5 million, of which approximately $4.7 to 4.8 million (hereinafter stated as $4.8 million) (about 96%) has already been spent; (3) the out-

---

and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas."

6. The force main is basically a long pipe built within what was formerly a wet-weather drainage ditch. Its purpose would be to carry treated wastewater from the treatment plant to the outfall/diffuser and, subsequently, into the Pamunkey River. For the most part, the force main runs along the route of an existing road in the County, however, it crosses through the path of a creek at three intermittent points. In recognition of the Court's skepticism respecting the Corps' permitting decisions, as expressed at the oral argument of the case, the County modified the technique it had intended to use in effectuating the three stream-crossings. Instead of directly digging through, and laying force main pipe in, the creeks (through implementation of standard open cut and backfill methods), the County chose to employ a technique known as "directional boring," by which the pipe was laid 4–5 feet underneath the creeks and adjacent areas. The directional boring cost the County an additional $87,000 to complete.

7. Approximately $1.2 million of this estimated cost is associated with construction of an influent pump station ("IPS") at the site of the plant. Approximately $538,000 has been spent on the IPS thus far (about 45%).

fall/diffuser is expected to cost approximately $500,000, of which none has been spent thus far; and (4) the interceptor is expected to cost approximately $6 to 7 million (hereinafter stated as $7 million), of which none has been spent thus far. Therefore, a total of approximately $10.3 million in construction costs have been expended on the project thus far, representing just over 31% of the total anticipated construction cost of the project.

Mr. Herzog and Mr. Frank Harksen, the County's Director of Public Utilities, testified as to the fiscal and other liabilities that the County expects to incur if an injunction were to prevent continued construction of the project. For example, Mr. Herzog testified that the County has contracted to buy equipment valued at approximately $3.8 million for use in construction of the WWTP which had not yet been delivered.[8] The County estimates that, if it were enjoined from continuing construction on the project pending the Corps' decision following remand, it would incur costs of approximately $205,000 per month in stand-by costs, which represent the costs for keeping the WWTP contractors available to work when (and if) the injunction is lifted.[9] Additional costs might be incurred by virtue of the cancellation of contracts with various sub-contractors involved in the project. In addition, the County posits that any substantial delay in construction would threaten its preparedness to meet the sewage treatment requirements forecast by the Comprehensive Plan.

It was further adduced at the October 3 hearing that, if no injunction were to issue, the County intended to continue construction of the WWTP (except for the IPS). If the County proceeded with construction of the WWTP pending the decision of the Corps, its total construction expenditures would reach approximately $24 million, which would represent approximately 73% of the total expected construction cost.[10]

After reviewing the August 14 Opinion, the County began to consider two (previously unconsidered) alternatives for delivering wastewater to the WWTP other than by way of the interceptor in the event that the Corps declined to issue a permit for, or concluded that the environmental impact foreclosed completion of, the project as planned.[11] Mr. Harken testified that the

---

8. It is undisputed that the County placed the orders for this outstanding equipment well in advance of the issuance of the August 14 Opinion. Mr. Herzog acknowledged that at least some of these contracts could be cancelled but speculated that, nevertheless, there would be substantial costs incident to any such cancellation (perhaps $2 million).

9. These estimated stand-by costs include, for example, maintaining a "skeleton staff" at the project site that would immediately be able to resume construction upon a favorable decision from the Corps; monthly equipment rental costs; and security at the project site.

10. In addition, the County expects that it would also expend $2.5 to $3 million (hereinafter stated as $3 million) in non-construction costs if it were permitted to proceed pending Corps' approval. This would raise the total

expenditure to $27 million of the expected $39 million price of the project (about 69% of the total cost).

11. It should be noted that the County has not explored wastewater treatment alternatives that would involve discharging treated sewage anywhere but into the Pamunkey River. Although this fact does not directly bear on the issue at hand (i.e., the propriety of injunctive relief), it is of fundamental importance to the real world context within which this litigation has arisen. Plaintiffs have asserted that there is a very real danger that the Pamunkey River, already classified as "impaired" pursuant to E.P.A. regulations, would be irreparably damaged by the volume of discharge that would result from the County's proposed sewage system. Plaintiffs assert that the Corps may not authorize construction of the project under these circumstances. See

County is actively exploring both alternatives, either of which (if implemented) would allow the WWTP to be operational by the present February 2003 target date. For either alternative, Mr. Harken explained, it would be necessary to construct an additional force main to carry wastewater to the WWTP. The environmental impact of the alternatives, however, has not been thoroughly examined.

Finally, there was evidence respecting the time-frame within which the parties expect the Corps to complete the actions to be taken on remand and to decide whether to issue permits for the project. Both Mr. Harksen and counsel for the Corps expressed the opinion that it generally takes about one year (give or take a few months) for the Corps to complete environmental assessments and make permitting decisions of the sort which the Corps currently has under consideration. It was generally agreed that this time frame is highly dependent upon the quality and comprehensiveness of the permit application submitted by the County and upon the Corps' overall workload.

## ISSUES PRESENTED

It is important at this stage to identify the issues presently before the Court because, in the days leading up to the October 3 hearing, the issues changed in two significant respects. The first change concerns a decision that the Corps made known in a letter dated September 25, 2001. There, the Corps informed the County that, after evaluating the August 14 Opinion, it "has determined that all four components of the County's expansion of its sewage treatment system should be consolidated into a single [Joint Permit Application] for review and processing of an individual ... permit." Accordingly, the Corps requested the County to "modify [its] current [application], along with the necessary appendices, drawings and supporting information, to include the WWTP, force main and outfall." [12]

This development is pertinent to whether an injunction should issue because, before the Corps' decision that is memorialized in the September 25 letter, the parties disputed whether the Court had jurisdiction to enjoin the County's construction activity on aspects of the project that were not specifically within the Corps' jurisdiction (*i.e.*, non-wetlands areas). Without opining on that issue as it stood before September 25; it seems rather clear now that the Corps' decision to treat the project for permitting purposes as just that, a *single* project, eliminates the need for any further assessment of that issue.

The second development, which was influenced in part by the Corps' decision to consider the project as a unitary whole, arose by virtue of a September 28, 2001 letter from Plaintiffs' counsel in which the Plaintiffs withdrew their request that injunctive relief should include a requirement that the County remove all "work performed in jurisdictional areas covered by the Nationwide permits that were invalidated." Therefore, the issue of affirmative injunctive relief, which carries costs and burdens not presented by a request for a purely prohibitory injunction, is no longer presented.

Accordingly, the remaining issues are: (1) whether the County can be enjoined from continuing construction on the project where the County itself has not been

33 C.F.R. § 320.4(a)(1); 40 C.F.R. § 122.4(i). This matter, entrusted to the discretion of the Virginia Department of Environmental Quality, is currently being litigated in state court.

**12.** The "current" application seeks issuance of an individual permit for the interceptor. The Corps' reference to the "outfall" includes the diffuser.

shown to have violated an environmental statute but, rather, is acting pursuant to an authorization given by the Corps, which *has* been held to have violated environmental statutes; and (2) if so, whether an injunction should issue.

## DISCUSSION

### A. Whether The Court Has Authority To Enjoin The County

The County contends that, because the Court did not find that the County itself had violated any environmental statutes, the Court may not issue an injunction against the County. The principal argument that the County proffers in support of this position is that "[t]ypically, decisions in this Circuit setting aside federal agency action remand the proceeding to the agency for further review not inconsistent with the court's decision." That point is correct as far as it goes. However, the County's argument cannot withstand serious scrutiny.

The County correctly points out that the August 14 Opinion: (1) set aside as arbitrary, capricious, and not in accordance with law, the decisions of the Corps respecting authorization for the project; and (2) remanded the matter to the Corps with orders to consider, in accordance with the opinion and pursuant to the applicable environmental statutes, several issues respecting environmental assessment and permitting for the project. *See Crutchfield,* 154 F.Supp.2d at 906. None of those environmental statutes, by their terms, limit the broad discretion of a district court to apply traditional equitable remedies to redress statutory violations. Absent such a limitation, "[i]t is well established ... that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *See, e.g., Porter v. Warner Holding Co.,* 328 U.S. 395, 398–99, 66 S.Ct. 1086, 1089–90, 90 L.Ed. 1332 (reversing circuit court's decision that district court had no jurisdiction to order restitution of rents collected by landlord in excess of permissible maximums under Emergency Price Control Act of 1942, and explaining that "[u]nless otherwise provided by statute, all the inherent powers of the District Court are available for the proper and complete exercise of that jurisdiction."); *Amoco Prod. Co. v. Village of Gambell, AK,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987); *Rambus, Inc. v. Infineon Tech. AG, et al.,* 164 F.Supp.2d 743 (E.D.Va. 2001) (*citing Richmond Tenants Org. v. Kemp,* 956 F.2d 1300, 1308 (4th Cir.1992)); *see also Lemon v. Kurtzman,* 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (explaining that, "[i]n equity, ... courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests...."); *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

It is equally well-settled that, upon a proper showing, an injunction is appropriate to remedy violations of the CWA, NEPA, and other environmental statutes. *See, e.g.,* Frank P. Grad, 4 Treatise on Environmental Law, § 9.04[2][b] (Matthew Bender 2000) (noting that, in NEPA suits, "the remedy invariably sued for and frequently granted is an injunction which prohibits the particular agency from proceeding with the project in question until an environmental impact statement is filed that meets the requirements of the Act. The Courts of Appeal of every circuit have upheld the courts' jurisdiction under the Administrative Procedure Act to grant injunctions to enforce NEPA."); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313–20, 102 S.Ct. 1798, 1804–07, 72 L.Ed.2d 91 (reading the CWA "as permitting the exercise of a court's equitable discretion ... to

order relief that will achieve *compliance* with the Act.") (emphasis in original); *Amoco Prod. Co.*, 480 U.S. at 542–43, 107 S.Ct. at 1402–03 (discussing traditional equitable balancing approach in context of Alaska National Interest Lands Conservation Act); *Sierra Club v. Marsh*, 872 F.2d 497, 501 (1st Cir.1989) (explaining that, although there is no presumption in favor of injunction to remedy violations of NEPA, " 'traditional' equity standards" apply); *Envtl. Def. Fund v. Froehlke*, 477 F.2d 1033, 1037 (8th Cir.1973) (recognizing that "the injunction is the vehicle through which the congressional policy behind NEPA can be effectuated....").[13]

The County's position to the contrary is based on the decision in *Ellis v. Ritchie*, 803 F.Supp. 1097, 1106–07 (E.D.Va.1992) which held that the director of the Virginia Housing Development Authority had failed to comply with applicable federal regulations and, thereupon, remanded the matter to the agency with no discussion respecting the authority to issue, or the propriety of, injunctive relief. The opinion in *Ellis*, as well as the general proposition for which the County proffers it, is good law. *See also Sierra Club v. U.S. Army Corps of Engineers*, 772 F.2d 1043, 1053–55 (2nd Cir.1985) (holding, in part, that lower court improperly substituted its own judgment

respecting Corps' decision about issuance of dredging permit and stating that "the Supreme Court has repeatedly held that if an administrator's action is not 'sustainable on the administrative record ... the decision must be vacated and the matter remanded....' ") (citing Supreme Court cases). That rationale, of course, is why the August 14 Opinion ordered the very remand that the County urges. *See Crutchfield*, 154 F.Supp.2d at 904–05 (ordering that "[o]n remand, the Corps must consider whether the entire wastewater treatment system ... are a 'major federal action,' and, if so, fulfill the requirements of NEPA...."). However, neither the decision in *Ellis*, nor the one in *Sierra Club* (and none of the Supreme Court decisions cited in *Sierra Club*) in any way forecloses the use of equitable remedial measures, such as an injunction, in order to assure that the objectives of the statute are accomplished pending an administrative agency's post-remand decision.[14]

Moreover, it is clear that, in appropriate circumstances, an injunction can issue even absent any showing of past misconduct. For example, in *United States v. W.T. Grant Co.*, the Supreme Court of the United States examined the prohibition against interlocking corporate directorates contained in section 8 of the Clayton Act. 345

---

**13.** Such an injunction "in a NEPA context can issue against a nonfederal party who receives federal financial assistance in furtherance of the challenged activity." *Homeowners Emergency Life Protection Comm. v. Lynn*, 541 F.2d 814, 818 (9th Cir.1976) (remanding to district court to determine whether prerequisites to injunctive relief existed such that city could be enjoined from construction of dam pending environmental impact statement); *see also Zarrilli v. Weld*, 875 F.Supp. 68, 71 (D.Mass.1995).

**14.** Instead, those decisions focus on the standard for judicial review of agency action. They stand for the proposition that, in reviewing agency action under a statute or regula-

tion, a district court may not simply decide that an agency has acted improperly and enter judgment contrary to the agency's decision. That, of course, is because courts review agency interpretations of statutes and regulations deferentially (*see, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)) and, when interpretative or decisional errors are found, courts give agencies the opportunity to correct their mistakes. The Court is unaware of any decision that (absent a specific statutory prohibition) forecloses additional injunctive relief in cases where it is shown to be necessary. The County certainly has cited none.

U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The defendant argued that, by the time of trial, the allegedly unlawful interlocks no longer existed and that there was no intention to revive them. In discussing the relevance of those facts, the Court stated that "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *Id.* at 633, 897, 73 S.Ct. 894. The Court went on to explain that:

> The purpose of an injunction is to prevent future violations ... *and, of course, it can be utilized even without a showing of past wrongs* .... The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. *Id.* at 633, 898, 73 S.Ct. 894 (emphasis supplied).

*See also Orantes–Hernandez v. Thornburgh,* 919 F.2d 549, 564 (9th Cir.1990) (stating that "[p]ermanent injunctive relief is warranted where [there is] a strong likelihood of future violations."); *Lovell v. Brennan,* 728 F.2d 560, 562–63 (1st Cir. 1984); *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 552 (W.D.Va.1975)

(stating that "[s]ince equity looks to the future, injunctive relief is ... appropriate, even in the absence of a showing of past violations, where the defendants' conduct or statements threaten future violations.").

■ These fundamental principles illustrate that the Court possesses authority to issue, upon satisfaction of the requisites therefor, an injunction that would prevent the County from continuing to build the project until such time as the environmental impact of the project as a whole has been properly assessed and the Corps decides to authorize construction.[15] It is true, as the County urges, that "[t]he integrity of the Nation's waters ... not the permit process, is the purpose of the [CWA]." *Romero–Barcelo,* 456 U.S. at 314, 102 S.Ct. at 1804. Nevertheless, as the Supreme Court has recognized, "[t]his purpose is to be achieved by *compliance with the Act, including compliance with the permit requirements.*" *Id.* at 315, 102 S.Ct. at 1804.

Moreover, it is beyond question that "NEPA is designed to influence the decision-making process; its aim is to make government officials notice environmental considerations and take them into account." *Marsh,* 872 F.2d at 500, 504. (emphasizing that "the harm at stake in a NEPA violation *is* a harm to the *environ-*

---

**15.** It should be noted that, although an injunction issued here would be termed "permanent," it could be dissolved if the Corps ultimately decides that the project may proceed. Thus, the requested injunction in this case would delay construction only until such time as that decision is made properly. *See e.g., Save Our Sound Fisheries Assoc. v. Callaway,* 387 F.Supp. 292, 309–10 (D.R.I.1974) (holding that court had power to enjoin proposed federal action until delinquent agency complies with procedural mandates but that "once an agency complies satisfactorily with the requirements of ... NEPA, an injunction entered against a proposed project should be vacated."); *Sierra Club v. Mason,* 351 F.Supp.

419, 429 (D.Conn.1972) (enjoining defendants from proceeding with proposed dredging and dumping until alternatives fully considered) (*modified by Sierra Club v. Mason,* 365 F.Supp. 47, 50 (D.Conn.1973)) (granting defendant's motion to dissolve injunction, after final EIS properly prepared, because no showing that defendants were threatening to renege on commitments made pursuant to that EIS); *Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army,* 342 F.Supp. 1211, 1217–18 (E.D.Ark.1972) (vacating prior injunction where defendants, having complied with NEPA, were no longer acting *ultra vires*).

*ment,* not merely to a legalistic 'procedure,'...."). Without yet addressing the issue of the degree to which continued construction of the project might improperly influence the Corps' consideration of the Court's directives on remand, it suffices to say that the statutes involved contemplate environmental impact assessment *before, not after,* that impact has occurred. *See, e.g., Marsh,* 872 F.2d at 500 (explaining that "the harm at stake [in NEPA cases] is a harm to the *environment,* but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis ... of the likely effects of their decision on the environment.") (emphasis in original); *Massachusetts v. Watt,* 716 F.2d 946, 952–53 (1st Cir.1983) (explaining that NEPA seeks to "present[ ] government decision-makers with relevant environmental data *before* they commit themselves to a course of action[ ] [because] [o]nce large bureaucracies are committed to a course of action, it is difficult to change that course....") (emphasis in original); *Jones v. D.C. Redevelopment Land Agency et al.,* 499 F.2d 502, 512–13 (D.C.Cir.1974) (stating that "NEPA was intended to ensure that decisions about federal actions would be made only after responsible decisionmakers had fully averted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs [and] before there has been an 'irretrievable commitment of resources.'"); Grad, 4 Treatise on Environmental Law, § 9.04[2][b] (stating that "an injunction is the only remedy designed to prevent a possibly irreversible change to the environment before the range of potential environmental consequences of the proposed action can be fully explored.")

Finally, as the August 14 Opinion makes clear, the County was highly instrumental in pressing the Corps to verify use of NWPs 26, 12, and 17 as to the WWTP, the force main and outfall/diffuser, respectively. And the County, like the Corps, knew that the Plaintiffs were asserting that it was improper for the County to proceed under the NWPs. The County undertook the construction here at issue, therefore, with full knowledge of the risk that an injunction might issue if its position was determined to be incorrect. Surely, County officials knew that, if the Plaintiffs were correct, the construction would have been accomplished outside of the environmental laws and that, as a consequence, the County could be enjoined from continuing construction. This is because such an improper course of conduct can always be stopped by injunctive relief, so as to protect the integrity of statutorily mandated environmental evaluation processes.

For the foregoing reasons, the County is subject, upon proper proof, to an injunction.

## B. Whether An Injunction Should Be Entered In This Case

■■■ While erasing any doubts about the *authority* of district courts to issue injunctions pursuant to the CWA, the Supreme Court, in *Romero–Barcelo,* explained that "[r]ather than requiring a district court to issue an injunction for any and all statutory violations, the [CWA] permits the ... court to order that relief it considers necessary to secure prompt compliance with the act. That relief can include, but is not limited to, an order of immediate cessation." 456 U.S. at 320, 102 S.Ct. at 1807. *See also* Grad, 4 Treatise on Environmental Law, § 9.04[2][b] (stating that "[t]he granting of an injunction for NEPA noncompliance is not automatic, and [particularized analysis is required in each case].");  *Conservation Law Foundation,* 79 F.3d at 1272; *Watt,* 716 F.2d at 952. In sum, each

case must be examined on its own facts and it is only when the record indicates a need for injunctive relief to remedy a violation of the CWA, or to achieve its purposes, that a court may issue an injunction.

In assessing, on a case by case basis, whether an injunction is necessary, it is appropriate to apply the balancing test traditionally used to determine the propriety of injunctive relief. In particular, "[p]ermanent injunctive relief is appropriate where (i) there is no adequate remedy at law, (ii) the balance of the equities favors the moving party, and (iii) the public interest is served." *Rambus v. Infineon Tech. AG*, 164 F.Supp.2d 743 (*citing Nat'l Org. for Women v. Operation Rescue*, 726 F.Supp. 1483, 1496 (E.D.Va. 1989)); *see also New York State Nat'l Org. of Women v. Terry*, 704 F.Supp. 1247, 1262 (S.D.N.Y.1989); *Southern Packaging & Storage, Co. v. United States*, 588 F.Supp. 532, 544 (D.S.C.1984); *Nissan Motor Corp. v. Maryland Shipbuilding & Drydock Co.*, 544 F.Supp. 1104, 1122 (D.Md.1982) *aff'd*, 742 F.2d 1449 (4th Cir.1984); *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.*, 550 F.2d 189, 195 (4th Cir.1977). The parties appear essentially to agree that this is the proper construct within which to consider the appropriateness of an injunction.[16]

**16.** Both parties, however, mention "irreparable injury" as a factor in the equation. As this Court noted in *Rambus*, "[i]n the context of a permanent injunction, it is not necessary for [the moving party] to show that it will be irreparably harmed by the failure to grant the injunction." No. 3:00CV524, at 23–24 (explaining that "[i]rreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.") (*citing Crane v. Indiana High School Athletic Assoc.*, 975 F.2d 1315, 1326 (7th Cir. 1992)) (citing other cases).

**17.** *See* Bob *Piazza, Plant's Permits Invalid,* RICHMOND TIMES DISPATCH, August 16, 2001, at

### 1. Adequacy Of Legal Remedy

At its core, the Plaintiffs' argument is that there is no adequate legal remedy because of "the likelihood [that] [the County's] investment in and construction of [ ] [the project] [will] prejudice and foreclose any genuine consideration of alternatives." Plaintiffs posit that the County "has considered the [project] a foregone conclusion since its inception, and that this Court's decision has not altered [the County's] intractable attitude." To support this contention, the Plaintiffs rely on what they (and some judicial decisions) identify as the reluctance of an agency to arrive at a regulatory decision that will render useless previously completed construction on projects. The Plaintiffs also point to comments made by counsel for the County (and quoted in local newspapers) to the effect that the Court's decision is merely a "temporary setback" that will not "materially affect the final completion date for the project."[17] In a related argument, the Plaintiffs assert that the County already is exerting political pressure on the Corps. In support of that assertion, they rely on a June 14, 2001 letter from Virginia Senator John Warner to the Corps inquiring about the progress of the permitting process for the project.[18]

A1; Lena Penalosa, *Judge Revokes Three County Wastewater Permits,* HANOVER HERALD-PROGRESS, August 16, 2001.

**18.** There is no merit in the assertion of political pressure based on the letter from Senator Warner. The letter is no more than one part of the continuous political dialogue that often surrounds projects of this sort. The letter simply makes clear that Senator Warner and his constituents are interested in the progress of the project. The Senator requests clarification respecting on-going litigation respecting the project, a time-line of the Corps' activities involving it, and a status report about construction. The letter in no way overreaches nor intimates that the imposition of any im-

The County, on the other hand, argues that: (1) its actions respecting post-August 14th construction on the project "pose no ongoing threat of environmental injury;"[19] (2) the relief sought by the Plaintiffs is beyond the scope of the claim they filed (apparently because the Plaintiffs failed to bring a citizen suit under the CWA itself and, instead, chose to proceed under the APA);[20] and (3) no injunction is necessary because, pending post—remand review, the County has delayed construction on all aspects of the project that require Corps evaluation and permitting.[21]

### a. The Law

The Plaintiffs' argument that continued construction on the project and its consequent influence on agency decision-making establishes the inadequacy of any legal remedy is certainly not novel. To the contrary, the Plaintiffs' contention is based on a body of decisional law assessing the propriety of injunctive relief in environmental suits that have arisen in the same general context as the present dispute.

The United States Court of Appeals for the Fourth Circuit has addressed on several occasions the degree to which substantial investment in, and continued construction of, environmentally-suspect projects may foreclose proper regulatory scrutiny of those projects. For example, in *Arlington Coalition on Transportation v. Volpe*,

458 F.2d 1323, 1325–26 (4th Cir.1972), the Fourth Circuit considered a citizen group's challenge to construction of a proposed segment of Interstate Route 66. "Most planning and preliminary work ha[d] been done" on the project and "[m]ost of what remaine[d] to be done [was] actual construction, which ha[d] scarcely begun...." *Id.* at 1328. The district court refused to grant the plaintiffs relief but, upon finding that the mandates of NEPA applied to the project, the Court of Appeals held that it was necessary to delay construction pending preparation of an EIS. *Id.* at 1326 (holding that "even essential highway construction must yield to the congressionally structured priority [set forth in NEPA]."). In holding that the citizens group was "entitled to an injunction against any and all further work on Arlington I–66 pending preparation and consideration of the environmental report," the Court of Appeals discussed the potential effects that construction might have on that "consideration," explaining that:

> *Further investment* of time, effort, or money in the proposed route *would make alteration or abandonment* of [it] *increasingly less wise and, therefore, increasingly unlikely.* If investment in the proposed route were to continue prior to and during the Secretary[ ] [of the United States Department of Transpor-

---

proper influence is a viable threat. Under the circumstances, the Court declines to impugn the well-settled precept that political discourse and dialogue are vital to a healthy democracy. *See, e.g.,* U.S. Const. amend. I.

**19.** This contention is supported by the affidavit of Steven P. Herzog.

**20.** The County has cited no case law in support of this argument and failed to press it at oral argument. Instead, the County relies entirely on the conclusory statement that a citizen suit claim under the CWA "would have raised different legal and factual issues

than those the Court has addressed here." However, it fails to articulate those "different issues." In any event, as explained above, injunctive relief is appropriate in CWA and NEPA actions and the County has not demonstrated how plaintiffs' failure to bring a citizen suit under the CWA changes this fact.

**21.** It should be noted that the parties have failed specifically to organize their arguments within the applicable 3 part-test for injunctive relief. The Court has attempted to fit the particular points of contention within that analytical framework, to the best of its ability.

458

tation's] consideration of the environmental report, then *options open to the Secretary would diminish, and at some point his consideration would become a meaningless formality.* Given the purpose of NEPA to insure that actions taken by federal agencies be taken with due consideration of environmental effects ... it is especially important ... that the [EIS] be prepared early. If ... no [EIS] is required until the final approval stage [ ] then it *could be well too late to adjust the formulated plans so as to minimize adverse environmental effects.* Once the highway-planning process has reached these latter stages, flexibility in selecting alternative plans has to a large extent been lost.... *Either the [highway planners] will have to undergo a major expense* in making alterations in a completed [plan] *or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass.*

*Id.* at 1333–34 (emphasis added).

The Court of Appeals expressed similar concerns when it decided *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039 (4th Cir.1986). In *Gilchrist,* the Fourth Circuit again confronted an attempt by a citizens group to prevent officials from constructing a highway, this time one that was designed to pass through a state park. The defendant county officials had prepared a draft EIS for the project, however, by the time of the appellate decision, the final EIS was still pending. *Id.* at 1041. The district court granted the defendants' motion to dismiss. *Id.* Approximately 26% of the road had been constructed by the time of appeal. *Id.* at 1042.

After finding that, "[b]ecause of the inevitability of the need for at least one federal approval ... the construction of the highway will constitute a major federal

action[,]" the Court of Appeals concluded that "compliance with NEPA is required before any portion of the road is built." *Id.* The Court remanded and instructed the district court to consider the plaintiff's motion for preliminary injunction. *Id.* at 1043. In doing so, it explained that:

The *decision of the Secretary* of the Interior to approve the project ... *would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS.* The *completed segments would stand like gun barrels pointing into the heartland of the park....* It is *precisely this sort of influence on federal decision-making that NEPA is designed to prevent.* Nonfederal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli.*

*Id.* at 1042 (*citing San Antonio Conservation Society v. Texas Highway Dept.,* 400 U.S. 968, 971, 91 S.Ct. 368, 369, 27 L.Ed.2d 388 (1970)) (Black, J., dissenting from denial of certiorari); *see also Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1157 (9th Cir.1988) (reversing district court's decision to issue injunction under NEPA and Federal Coal Leasing Amendments Act of 1976, remanding for evidentiary hearing, and recognizing that "[b]ureaucratic rationalization and ... momentum are real dangers, to be anticipated and avoided by the Secretary [of the Interior].").

More recently, in *North Carolina v. City of Virginia Beach,* 951 F.2d 596 (4th Cir. 1991), the Fourth Circuit had under review the construction of an 85–mile pipeline from Lake Gaston, a man-made lake lying partly in both Virginia and North Carolina, to the City of Virginia Beach. Virginia Beach had obtained a permit for construction of the pipeline from the Army Corps

of Engineers; however, it had not obtained a necessary approval from FERC. *Id.* at 598. The City had spent over $18 million on the project (out of an expected $218.9 million), which was impelled by an imminent and severe water shortage. The city claimed that, "to keep the project reasonably on schedule[,]" it needed to undertake at least two critical tasks that were beyond FERC's jurisdictional authority and, together, would cost an additional $8.4 million. *Id.* at 600.

The Fourth Circuit held that "commencement of construction of two relatively small portions of the pipeline project outside FERC['s] [jurisdiction] does not apply such public and political pressure on FERC that it will be unable rationally to discharge its statutorily imposed responsibilities and that this construction will not interfere with FERC's responsibilities in conducting an environmental review on other parts of the pipeline." *Id.* In doing so, however, the Court of Appeals reiterated, as valid, the principles set out in *Gilchrist* and recognized that "if construction of the *entire* pipeline up to the border of FERC's jurisdiction were permitted, there may come a point where the construction and the concomitant expenditure of funds would create so much pressure [as to be an improper influence on proper regulatory scrutiny]. Thus, an injunction that prevents Virginia Beach from completing the entire pipeline before FERC has given its approval cannot be said to be invalid even if the construction itself will not violate NEPA." *Id.* However, because Virginia

Beach sought only "to perform relatively minor work on aspects of the pipeline outside FERC's jurisdiction that will save precious time and money if the project is approved," *id.* at 603, the Court held that "construction which lies beyond the boundaries of FERC's jurisdiction can be enjoined *only when it has a direct and substantial probability of influencing FERC's decision.*" *Id.* (emphasis supplied).[22] Against that standard, the Court explained, "the reach of the injunction entered ... prohibiting the two relatively minor phases of construction sought in Virginia Beach's motion ... cannot as a matter of law be justified." *Id.*

### b. The Law Applied To The Facts

▮ The decisional law teaches that a number of factors are germane to assessing whether construction of a project pending a federal agency's environmental assessment is likely to threaten the agency's objectivity in conducting that assessment. Among them are: (1) the total financial cost of the project as compared to both the amount that has been spent thus far and the additional amount that the project proponent would spend pending agency review; (2) the percent of the project that has been completed before agency review begins as compared to the percent that would be completed if construction continued pending agency review; (3) the financial liabilities of the project proponent in the event that it is enjoined from continuing construction; (4)

---

**22.** *See also Sansom Committee v. Lynn*, 382 F.Supp. 1242, 1245 (E.D.Pa.1974) (explaining that "[i]t is in the discretion of the trial court whether work on the entire project must be halted pending completion of the impact statement, or whether work may proceed on a limited area of that project.") (*citing Environmental Defense Fund v. Froehlke*, 477 F.2d 1033, 1037 (8th Cir.1973)); *but see Sierra Club v. Mason*, 351 F.Supp. 419, 426–28 (D.Conn.1972) (stating that "in the absence of extraordinary equities on the government's side, the requirement of an impact statement must be enforced by an injunction whenever the proposed project poses a substantial risk of damage to the environment and there exists a reasonable probability that adequate consideration of alternatives might disclose some realistic course of action with less risk of damage.").

the amount of the project that is within the decisional jurisdiction of the regulatory body as compared to the project as a whole; (5) the public need sought to be addressed by the project under consideration and the applicable goals and deadlines within which the project proponents are operating; and (6) any indications from the regulatory body that bear upon whether it will be able to conduct its environmental review objectively.[23]

■ Assessment of these factors, as they are shown by this record, leads to the conclusion that further investment in the WWTP "would make alteration or abandonment [of this project] increasingly less wise and that there is a substantial likelihood that, as the WWTP nears completion, the Corps' consideration would become a meaningless formality." *See Arlington Coalition on Transportation v. Volpe*, 458 F.2d at 1333–34. Each factor is considered below.

First, of the projected $33 million construction cost for the entire project approximately $10.3 million (about 32%) has been spent to date. Second, of the projected $19 million construction cost for the WWTP approximately $5.5 million (about 29%) has been spent to date. The only other of the project's four components (the force main) for which construction funds have been expended is virtually complete ($4.8 million out of an expected $5 million has been spent, or approximately 96%). No funds for the outfall/diffuser (which has a projected cost of $500,000) or the interceptor (which has a projected cost of $7 million) have been expended.

The County has committed not to commence construction of the outfall/diffuser or the interceptor until after the Corps makes its decision. In addition, the only remaining work on the force main is the cosmetic repair of the trenched area within which the pipe has been placed. Thus, in fact, the real issue here is whether further construction of the WWTP (the largest component of the project), which itself is 29% completed, should be enjoined.

Second, the Corps' review will not begin until the County tenders a joint application (which had not been done as of October 3). Thus, the percentage of completion of the WWTP before the commencement of agency review is 29%. If, as is expected, the Corps' review takes up to one year, the WWTP (except for the IPS aspect thereof) will be nearly 100% completed before the Corps makes its permitting decision. That, of course, means that the entire project would be 73% complete by the time that the Corps decides whether an environmental impact statement is required.

Third, the County's liabilities in the event of an injunction are rather uncertain. For instance, although the County has placed purchase orders for about $3.8 million in equipment to be used in building the WWTP, some of those contracts can be cancelled. Equipment from contracts that could not be cancelled, of course, could be used when construction resumes if, as the County anticipates, the Corps issues the requisite permit. The costs associated with total cancellation of these purchase orders is said to be approximately $2 million, but that is an imprecise, indeed, speculative, estimate. If the County elects to keep its WWTP contractors on stand-by so that construction can resume immediately (if the Corps acts as the County expects it

---

**23.** An additional factor that courts have discussed in this context is whether the party seeking the injunction timely moved for such relief. In this case, the County argues that Plaintiffs are in laches because they failed to seek preliminary injunctive relief at an earlier stage of this litigation. This factor will be discussed in the section of this opinion dealing with balancing the equities. *See infra.*

to act), the County will incur $205,000 per month in so-called "stand-by" costs. If, as expected, the Corps' action does not occur for 12 months, the stand-by costs would be in the range of $2.46 million. However, the record contains no suggestion that the County actually intends to incur stand-by costs for such a long period.

The alternative would be to forego the stand-by option and then start construction again after the Corps makes its decision. The record does not reflect what those start-up costs might add to the cost of constructing the WWTP.

Fourth, in accordance with the August 14 Opinion, the Corps has made it clear that it no longer views any aspects of the project as beyond its regulatory jurisdiction. Therefore, to the extent that the County still takes the view that it should be permitted to proceed with construction on those aspects of the project that are outside the jurisdiction of the Corps, that position is no longer viable and need not be further addressed.[24]

Fifth, the public need sought to be addressed by the project is an important one for a number of reasons and the Plaintiffs do not contend otherwise. However, on this record that need can be met—even if the Corps' decision does not issue for 12 months—by the County's contract with Henrico County, given that the record shows substantial unused capacity under that contract for each of the past 3 years.[25]

Sixth, the record is ambiguous about the ability of the Corps to conduct the review objectively. As outlined in the August 14 Opinion, the Corps predicated its original decision on a remarkably illogical premise, persuaded the Virginia Department of Historic Preservation to change its view on the central topic respecting how to evaluate the project, and summarily rejected the Plaintiffs' comprehensively documented contentions about the criteria for, and approach to, evaluating the project. *See Crutchfield,* 154 F.Supp.2d at 898. As the Plaintiffs suggest, that history points toward a restricted willingness (or capacity) on the part of the Corps to conduct the requisite review objectively. On the other hand, the Corps demonstrated in its September 25 letter that, at least to some extent, it has distanced itself from its earlier conduct by announcing that it will evaluate the project as a whole, rather than piecemeal. That action illustrates, at a minimum, that the Corps is not prepared obdurately to defend an erroneous decision.

Further, the Corps has assigned the review to a new staff member who was not involved in the earlier decisional process. Apparently, however, the final decision will be made by the same chiefs who made the decision that was set aside for the reasons described in the August 14 Opinion. With-

---

**24.** The Court is not convinced that the County is correct in arguing that the Corps' jurisdiction begins and ends at the boundaries of geographical areas that legally can be described as wetlands. Without deciding the issue, it suffices to say that this is a cramped interpretation of the Corps' authority and of the environmental statutes giving rise to its regulatory review in this case. It would be illogical, for example, if, in carrying out its statutory mandate to regulate activities that will adversely affect wetlands, the Corps had absolutely no authority respecting areas directly adjacent to those wetlands. Similarly,

it makes no sense that, in deciding whether to permit activities that impact wetlands, the Corps should have no jurisdiction to permit or prevent activities that, while taking place outside of a wetland, have direct impact on the wetland.

**25.** Indeed, the record indicates that, since 1998, the minimum excess daily capacity under the contract with Henrico County has been approximately 900,000 gallons. *See supra* note 2.

out the Corps taking sides in the briefing on the injunctive relief issue, has expressed the view that it sees no need for injunctive relief to protect it from the pressures of decision-making in the face of the County's continued construction of the WWTP.[26]

In sum, the record taken as a whole is that, in the past, the Corps, confronted with considerable pressure from the County, made permitting decisions that defied logic and law.[27] And, it did so notwithstanding that another state agency involved in the process took much the same position as the Plaintiffs had. The pressure that the County exerted was partially responsible for the Corps' flawed decision. Moreover, if construction on the WWTP continues while the Corps is again reviewing the situation, the reality is that the WWTP is apt to be almost entirely completed by the time that the decision is made. By then, the County will have incurred about 73% of the construction cost of the project. Considering the record as a whole, there is a substantial likelihood that continued construction of the WWTP pending the Corps' decision would increase significantly the pressure to approve the project as tendered and would create an environment in which there is a substantial risk that the environmental impacts would be viewed as tolerable. At a minimum, there would exist pressures which, viewed realistically, restrict the regulators' options.

For the foregoing reasons, and in perspective of the applicable environmental statutes and the purposes they seek to achieve, the Plaintiffs have shown that they have no adequate remedy at law.

## 2. Balancing The Equities

Plaintiffs assert that the equities favor them because the County "cannot be considered an innocent party" in light of the fact that it displayed a lack of good faith in leading "the Corps to cut corners ... and avoid undertaking legally required procedures." They also allege that the equitable balance should be struck against the County because the County's "use of directional boring ... smacks of further effort to evade regulatory scrutiny." Finally, they submit that the County's plans to continue construction on the WWTP somehow deprives it of any equitable interest to be considered.

The Plaintiffs also point out that they repeatedly put the County and the Corps on notice that those parties were taking the wrong approach with respect to authorizing the project and therefore, that the County did not act equitably and comes to court with clean hands. Lastly, the Plaintiffs contend that, absent an injunction, they will suffer complete deprivation of the statutory guarantees to which they are entitled under the CWA, NEPA and the NHPA because the Corps cannot possibly be objective in the decisional process if the construction of the WWTP is allowed to continue.

The County's principal assertion of hardship is that, in the event of an injunction, it will incur the previously discussed stand-by or start-up costs and will incur the previously discussed cancellation expenses. This, the County contends, is a waste of public monies and, hence, an inequitable result, especially where it incurred

---

26. As explained above, the Plaintiffs' argument that the Corps is apt to be influenced by Senator Warner, the immediate past chair and the current ranking member of the Senate Armed Services Committee (which controls the Corps' budget), is rejected.

27. *Crutchfield v. United States Army Corps,* 154 F.Supp.2d at 884–891, 893–904.

the expenses in reliance on the Corps' verification of the NWPs.

There is no question that some "waste of public resources" will occur if the Corps ultimately decides that the project cannot go forward as planned and implemented to date. This fact does not weigh heavily in the balancing test, however, because any waste of resources would be the result not of any decision by this Court to enjoin the project pending Corps approval but, rather, of the Corps' decision on remand. In any event, any complaint that public funds (whether in the form of cancellation or stand-by costs or the cost of construction to date) may go to waste must be viewed in light of the conduct of those to whom the expenditure of those funds has been entrusted. The record here discloses that the County was put on notice, by the Plaintiffs as well as by a state agency, that verification of the NWPs rested on shaky ground. Moreover, the County was put on notice by the Plaintiffs that the NWPs likely would be attacked as invalid. It proceeded with construction of the project notwithstanding those circumstances. On the record as a whole, the County's attempt to wrap itself in equity's cloak is not persuasive. On the other hand, the Plaintiffs did all they could to make their position known and, absent an injunction, they stand to forfeit substantial rights that federal environmental law affords them.

The County asserts that Plaintiffs are lacking in equity here principally because they unreasonably delayed in seeking injunctive relief. To support that argument, the County points to *Conservation Law Foundation, Inc. v. Busey*, 79 F.3d 1250 (1st Cir.1996). In *Busey*, the First Circuit affirmed a district court's denial of injunctive relief where several environmental statutes (including NEPA) had been violat-

ed during an Air Force base redevelopment project.

The court contrasted cases such as *Marsh*,[28] where "plaintiffs moved for injunctions in the earliest stages of development of the projects at issue, when NEPA injunctions could implement the statutory purpose," with the case before it, where the plaintiff was aware of a defective EIS but waited nearly three years before moving for injunctive relief. 79 F.3d at 1272 (noting that, although complaints in the case "recited requests for permanent injunctions[,]" the parties never "moved to restrain or enjoin any aspect of the project."). Ultimately, the First Circuit denied the requested injunctive relief because (1) the state of New Hampshire had expended many millions of dollars (much of which had been raised through the issuance of general obligation bonds) to finance the project; and (2) much of this debt and expense had been incurred and expended between the time the plaintiffs filed their complaint and when they later moved for injunctive relief. *Id.* at 1272.

■■■ The County's argument, at its core, is that the Plaintiffs are in laches. "The doctrine of laches is based on the maxim that equity aids the vigilant, not those who sleep on their rights." *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir.2001). The doctrine is technically an affirmative defense to a suit at equity. Where a plaintiff unreasonably has slumbered on legal rights of which he was aware, and where the plaintiff's delay has prejudiced the defendant, the defendant may raise the defense that the plaintiff is in laches and should therefore be estopped from recovering on the merits. *See id.* at 798 (explaining that "[l]aches may be applied by a court to bar a suit in equity that has been

**28.** 872 F.2d 497 (1st Cir.1989).

brought so long after the cause of action accrued that the court finds that bringing the action is unreasonable and unjust."); *see also White v. Daniel,* 909 F.2d 99, 102 (4th Cir.1990) (noting that "whether laches bars an action depends on the particular circumstances of the case."); *Potter Instrument, Co. v. Storage Tech. Corp.,* 641 F.2d 190, 191 (4th Cir.1981). To establish that an adversary is in laches, the proponent of its application must establish: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *White,* 909 F.2d at 102 (*citing Costello v. U.S.,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961)). The decision whether to invoke the doctrine is within the sound discretion of the district court judge sitting as chancellor at equity. *See, e.g., Lyons Partnership, L.P.,* 243 F.3d at 797; *White,* 909 F.2d at 102; *Potter Instrument Co.,* 641 F.2d at 191.

■ The Fourth Circuit has acknowledged that the defense of laches might bar the issuance of a permanent injunction in an environmental suit. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel,* 872 F.2d 75, 79–80 (4th Cir.1989) (explaining that, "[a]lthough a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."). Although in *Quince Orchard* the Court of Appeals noted that "laches is not a favored defense in environmental cases," [29] it affirmed the lower court's denial of plaintiff's requested preliminary injunction where the plaintiff had delayed bringing suit until six months after all federal approvals for the project at issue had been granted.

■ It is true that the Plaintiffs did not move for a preliminary injunction in this case, but the County does not argue that, if they had done so, a preliminary injunction would have been granted. And, indeed, it is not at all clear that the Plaintiffs could have met the test for preliminary injunctive relief in this circuit. In any event, the record is absolutely devoid of any evidence that the County changed its position because the Plaintiffs did not seek preliminary relief. Indeed, the Plaintiffs, from the outset, put the County on notice that they thought the County and the Corps were proceeding improperly. The County knew, or reasonably should have known, that injunctive relief might ensue if the Plaintiffs were correct.

In any event, to the extent that the County may have been prejudiced by the Plaintiffs' decision to defer pressing for injunctive relief until the merits of their claim had been decided, the County could have avoided that prejudice by forestalling construction on the project until the litigation was concluded, and, after August 14, until the Corps had completed a full and proper environmental assessment. This, along with the recognition that laches is a disfavored defense in environmental suits, leads to the conclusion that, on this record, the effect on the balance of the equities of the Plaintiffs' failure to seek preliminary injunctive relief is offset by the fact that the County took a known risk in pressing forward with construction (first) in the face of a pending legal challenge and (later) with knowledge of an adverse decision.

### 3. The Public Interest

The County asserts that the public interest weighs against issuance of an injunc-

---

29. *See also Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774, 779 (9th Cir.1980) (citing cases and explaining that use of laches in environmental suits "should be restricted to avoid defeat of Congress' environmental policy.").

tion in this case because of the waste of public resources that would occur if the project is enjoined now but is ultimately allowed to proceed (after the Corps' renewed assessment). Plaintiffs, on the other hand, argue that "it would be even more unfair to [the] Hanover County taxpayers to allow the County's reckless officials to continue making risky investments in a project they know, or should know, faces serious and substantial obstacles." Plaintiffs suggest that "[t]he Hanover County Board of Supervisors [sic] must be accountable to the citizens and it is not this Court's responsibility to bail the County out of a predicament it could easily have avoided." [30]

The expenditure of public funds obviously is a matter of public interest. But, in the context of the issues involved here, it has been fully considered as a factor in assessing the adequacy of legal remedies and in balancing the equities. Because the same considerations that animated the finding that the Plaintiffs have no adequate remedy at law apply with equal force in the public interest analysis, no more need be said about the expenditure of funds than already has been said.

The final, and most significant, aspect of the public interest analysis is the County's need for the wastewater treatment facility and the degree to which an injunction might hinder effectuation of the County's Comprehensive Plan. The record indicates that, if the projected growth occurs, the County and its citizens will be in need of

the benefits that the project is expected to produce. Nevertheless, the public also has an interest in ensuring that Congress' stated environmental policies are effectuated and that community leaders consider those policies when deciding how and when to spend public funds. An injunction preventing construction on the project pending the Corps' authorization would also serve the public's interest in ensuring that federal regulators, to whom the day-to-day decisions respecting implementation of those congressionally-defined policies is entrusted, make their decisions as objectively as possible.

Moreover, and as explained above, the record shows that, for the past 3 years, the County has used considerably less wastewater treatment capacity than is available under its contract with Henrico County. That contract will remain in place for several years to come. Thus, while the Corps fulfills its duties, the County's needs can be met under that contract even if the project is delayed for 12 months. Accordingly, on this record, an injunction will not adversely affect the public interest in so great a way as to foreclose issuance of the kind of relief that will effectuate the environmental statutes that are involved here.[31]

### 4. The County's Purported Good Faith And The Issue of Prudential Mootness

Finally, the County claims to be proceeding in the "utmost good faith" and

---

**30.** Plaintiffs also contend that the County's investment in the project may well be wasted because, "among the environmental issues that must be addressed by the Corps on remand is that the primary pollutant in the proposed discharge, biological and chemical oxygen demand, may not lawfully be discharged to the Pamunkey River." As noted earlier, Plaintiffs contend that the Pamunkey River "already violates the water quality standard for dissolved oxygen" and that addition-

al discharges would violate federal and state regulations. *See* 40 C.F.R. § 122.4(i). *See supra* note 11. That issue is before the state courts and is not a factor to be considered here.

**31.** As noted earlier, if circumstances should change, the County can move to dissolve the injunction.

argues that, because "nothing before the Court suggests that the County cannot be held to its word [respecting delaying construction on the outfall/diffuser pending Corps approval]," no injunction should issue. As a corollary to this argument, the County states that "the doctrine of prudential mootness, along with principles of comity and federalism, reinforces the wisdom of accepting the County's pledge that it will not violate the CWA."

The County has given its word in open court, through its authorized counsel, that it will not proceed with construction of the outfall/diffuser or the interceptor before the Corps makes its decision. That representation, made by an officer of the Court, is absolutely binding on the County and is accepted by the Court. Accordingly, nothing further need be said on that topic.

The doctrine of prudential mootness, however, is inapplicable to the present dispute. The issue of prudential mootness usually arises "in the context of a request for preliminary injunction, where it seems that the defendant (usually the government) is in the process of changing its policies such that any repeat of the actions in question is unlikely." *American Constitutional Law Foundation, Inc. v. Davidson,* 211 F.3d 1277, 2000 WL 488460, at *2 (unpublished) (10th Cir.2000) (explaining that the doctrine may apply "even if there is no constitutional mootness problem" and remanding case with instructions for district court to dismiss where dispositions by Supreme Court and state district court left "nothing more for the federal courts to do...."); *see also Fletcher v. United States,* 116 F.3d 1315, 1321–22 (10th Cir. 1997) (explaining that doctrine applies when "a controversy, not constitutionally moot, is so 'attenuated that considerations

of prudence and comity for coordinate branches of government counsel the court to stay its hand and to withhold relief it has the power to grant.' "); *Southern Utah Wilderness Alliance v. Smith,* 110 F.3d 724, 727–28 (10th Cir.1997) (distinguishing mootness, which addresses court's power to grant relief, from prudential mootness, which addresses court's discretion in the exercise of that power); *Chamber of Commerce of the U.S.A. v. U.S. Department of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980) (describing prudential mootness as "a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration.") (*citing Warth v. Seldin,* 422 U.S. 490, 498–500, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975) and *U.S. v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).

■ Notwithstanding the County's promise in open court and the Corps' recent change in approach, this case is not moot because even now the County continues with construction on some aspects of the project and the Corps has not yet determined that it lawfully may do so. Clearly then, the doctrine of prudential mootness is inapplicable.

## CONCLUSION

For the foregoing reasons, appropriately tailored injunctive relief is necessary and the Plaintiffs' Motion for Injunction is granted.[32] The County will be enjoined from undertaking further construction on any and all aspects of the wastewater treatment project until such time as the United States Army Corps of Engineers completes the tasks with which it is

---

**32.** The County has withdrawn its Motion to Clarify the August 14 Opinion and, therefore, it has been denied as moot.

charged pursuant to the August 14 Opinion.[33]

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court finds that:

(1) absent the injunctive relief set forth below, the Plaintiffs have no remedy adequate at law to assure satisfaction by the United States Army Corps of Engineers of the obligations objectively to perform the environmental evaluations required by the Clean Water Act, the National Environmental Policy Act and the National Historic Preservation Act; and

(2) the balance of the equities favors the Plaintiffs; and

(3) the public interest favors an injunction; and Therefore, it is ORDERED that, until further Order of the Court after the United States Army Corps of Engineers completes the decisional process required of it by the Memorandum Opinion and Order entered herein on August 14, 2001, Hanover County is enjoined from continuing construction of any component of its wastewater treatment project except that it may perform the currently planned cosmetic and landscaping repairs associated with the previous construction of the force main.

The Clerk is directed to send a copy of this Order to all counsel of record, and counsel for Hanover County shall serve a copy of the Order (by personal service) on the Board of Supervisors, the County Manager and all contractors and consultants working on the construction of the wastewater treatment plant.

It is so ORDERED.

---

**33.** Having solicited the views of the parties respecting whether a bond is required, having considered these submissions, and having concluded that no bond is necessary or appropriate, none will be required.