Frances Broaddus CRUTCHFIELD and
Henry Ruffin Broaddus, Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS and County of Hano-
ver, Virginia Defendants.

No. CIV.A. 3:02CV253.

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 31, 2002.

William B. Ellis, Esquire, Benjamin A. Thorp, III, Esquire, Ellis & Thorp, Richmond, for Plaintiffs.

Gregory S. Williams, Esquire, U.S. Department of Justice, Environmental Defense, Environment and Natural Resources Division, Washington, D.C., Katherine D. Will, Esquire, U.S. Army Corps of Engineers, Norfolk Division, Norfolk, M. Hannah Lauck, Esquire, United States Attorney's Office, Richmond, for Corps.

Sterling E. Rives, III, Esquire, Yvonne S. Wellford, Esquire, Hanover County Attorney's Office, Hanover, William G. Broaddus, Esquire, McGuireWoods LLP, Richmond, for Hanover Co.

## MEMORANDUM OPINION

PAYNE, District Judge.

This action arises out of the ongoing efforts of Hanover County (the "County") to provide capacity to treat and dispose of the forecast increases in wastewater expected to accompany forecast growth in certain areas of the County. Under the circumstances outlined fully in a Memorandum Opinion issued on August 7, 2002 (the "August 7 Opinion"), the County planned, and began construction of, a wastewater treatment project that would impact a small amount of wetlands, and therefore required authorization from the United States Army Corps of Engineers (the "Corps"). *Crutchfield v. United States Army Corps of Engineers*, 214 F.Supp.2d 593 (E.D.Va.2002) (*"Crutchfield II "*).

The Corps initially authorized the County to proceed with the project under the authority of Nationwide Permits ("NWPs"). In *Crutchfield v. United States Army Corps of Engineers*, 154 F.Supp.2d 878, 906 (E.D.Va.2001) (*"Crutchfield I "*), the Corps' decision was set aside as arbitrary, capricious, and not in accordance with law. The matter was remanded to the Corps for reconsideration.[1] In April 2002, the Corps again au-

---

1. The Corps did not appeal the decision in *Crutchfield I*. The County noted an appeal, then withdrew it under circumstances not

thorized the County to proceed with the project under the authority of NWPs. The Plaintiffs again challenged the decision of the Corps, and the Corps' decision again was set aside as arbitrary, capricious, and not in accordance with law. The matter was then remanded to the Corps for reconsideration. *See Crutchfield II*, 214 F.Supp.2d at 655.

In their Complaint, the Plaintiffs alleged that they were entitled to permanent injunctive relief, if they prevailed on the merits. The Plaintiffs now seek an order enjoining the County from constructing, or allowing a third party to construct, any portion, component, or aspect of the project while the Corps reconsiders the matter on remand. For the reasons that follow, the Plaintiffs' motion is denied.

## BACKGROUND

The August 7 Opinion, along with the opinions in *Crutchfield I*, set forth the historical background respecting the County's wastewater treatment project and the permitting decisions made by the Corps. Those opinions collectively describe the full course of the administrative process and the earlier litigation in the matter. The August 7 Opinion, in particular, describes the framework within which the issue of injunctive relief now under consideration arises; and therefore, it is incorporated here in the interest of brevity. Nonetheless, a brief outline of the facts relevant to the assessment of the request for injunctive relief is useful.

For some years, the County has pursued the project at issue here as a means of addressing a projected shortfall in wastewater treatment capacity. In its original iteration, this project consisted of a wastewater treatment plant ("WWTP"), an interceptor pipeline running along the Totopotomoy Creek (the "TC Interceptor") to

here pertinent and then filed another appeal which was dismissed as moot.

collect sewage and transport it by gravity flow to the WWTP, a forcemain taking processed waste from the WWTP to the discharge location in the Pamunkey River adjacent the Plaintiffs' family farm ("Newcastle Farm"), and an outfall/diffuser structure where the waste actually discharges into the river. Because this project impacted wetlands, federal environmental statutes and regulations required the County to secure appropriate permits from the Corps.

As explained fully in *Crutchfield I*,[2] the Corps' regulations delineate two broad categories of permits: a general permit, of which an NWP is one sub-type, and an individual permit. Use of an NWP is allowed following a form of approval known as "verification." Use of an individual permit follows issuance of the individual permit. Verification to use an NWP necessitates a substantially less rigorous review of environmental issues than that which must precede issuance of an individual permit.

In June 2000, the Corps verified that the County could proceed, under the authority of three NWPs, with construction of all components of the project as then conceived, except the TC Interceptor, which the Corps decided to consider separately from the rest of the project under an application for an individual permit. The Plaintiffs challenged the decision of the Corps to consider the TC Interceptor separately, a decision that freed the Corps of the responsibility to conduct environmental assessments that otherwise would have been required under the relevant federal environmental protection laws. On August 14, 2001, the Court held that the Corps' decision to authorize construction of some of the components under those NWPs without considering the impact of the TC

**2.** 154 F.Supp.2d at 893–94. *See also Crutchfield II,* 214 F.Supp.2d at 599–60.

Interceptor (which clearly was an integral part of a cohesive four part project) to be arbitrary, capricious and not in accordance with law. *See Crutchfield I*, 154 F.Supp.2d at 895–903. In so doing, the Court noted that the Corps, at the urging of the County, arrived at a "remarkably illogical conclusion" respecting whether WWTP, the force main, and the outfall/diffuser had "independent utility" from the TC Interceptor sufficient to justify separate consideration. *See id.* For that reason and others explained in *Crutchfield I*, the Corps' decision to allow part of the project to proceed under three NWPs (while it considered the County's application for an individual permit for the TC Interceptor) was vacated and the matter was remanded for reconsideration.

After prevailing on the merits in *Crutchfield I*, the Plaintiffs filed a motion for permanent injunction to halt construction on the project pending the Corps' reconsideration on remand.[3] On November 2, 2001, the Court granted the Plaintiffs' motion, finding, *inter alia*, that, if the County continued work, there was a "substantial probability" that further construction on the project would unduly influence the Corps, thereby rendering objective review of the environmental impacts impossible. *See* 192 F.Supp.2d 444, 455–66 (E.D.Va. 2001) (the "November 2 Injunction Opinion").

In November 2001, the County reassessed the project and modified it to ex-

clude the TC Interceptor, the component having the greatest impact on wetlands. Instead, the County proposed to collect and convey wastewater to the WWTP through the so-called Lee Davis Pump Station and forcemain, which consists of a pump station serving approximately five square miles of the County's service area to the south of the Totopotomoy Creek watershed, and a forcemain connecting the pump station to the WWTP. The County then filed a Joint Permit Application ("JPA") with the Corps on November 16, 2001.[4] In all respects other than the Lee Davis Pump Station and forcemain, the project was the same as originally proposed.

At a pre-application meeting held on November 9, 2001 between the County and the Corps, the County again urged the Corps to consider authorization of the project under NWPs. The Corps declined. In a November 16, 2001 Memorandum for the Record (the "November 16 MFR"), Ms. Pamela K. Painter, the person to whom the Corps had assigned primary responsibility over the County's revised JPA, stated that "[a]s a result of the recent litigation, the Corps will be processing the application as an individual permit rather than as Nationwide Permits." A.R., at 2654. The Corps made the same representation in pleadings filed with the Court.

The Corps, in accordance with regulations governing the procedure for consid-

---

**3.** During the construction of the WWTP which took place from the time the NWPs were issued until the decision on the merits in *Crutchfield I* was issued, much of the wetlands affected by the County's project, which, of course, formed the Corps' jurisdictional predicate, were obliterated. The County modified other parts of the project to avoid intrusion into the jurisdictional wetlands, and voluntarily abstained from constructing the outfall/diffuser part of the project pending conclusion of the litigation.

As a consequence of these circumstances, the focal point of the requested injunctive relief was construction of sections of the WWTP not located on the wetlands and some relatively minor work that would occur during remand at the sites of the already obliterated wetlands at the WWTP.

**4.** The County also asked the Court to dissolve the injunction in light of change of circumstances. The Court denied this request in *Crutchfield v. United States Army Corps of Engineers,* 175 F.Supp.2d 835 (E.D.Va.2001).

ering individual permits, thereafter issued public notice of, and received public comment on, the revised project. The Plaintiffs, in particular, communicated diligently with the Corps. On January 18, 2002, the Plaintiffs visited the project site with Ms. Painter and raised numerous concerns, including whether the County had been completely forthcoming about its intentions respecting the TC Interceptor. *See Crutchfield II*, 214 F.Supp.2d at 611 (citing A.R., at 2731–32). On January 25, 2002, the Plaintiffs followed-up on their site visit discussions with Ms. Painter with a 26–page letter outlining their numerous concerns about, and objections to, the project, including their belief that the County's JPA was incomplete in that it excluded the TC Interceptor. *See id.* at 611–12 (citing A.R., at 1613–38).

On February 11, 2002, the Plaintiffs commented to the Corps about an application filed by The Hanover Group ("THG") for an individual permit to build a 9,800 foot sewer main in connection with a project known as the Bluffs at Bell Creek (the "Bell Creek Project"). That sewage collection main was known as the Academy Creek Trunk Sewer (the "AC Sewer"). The Plaintiffs noted that about one-quarter of the AC Sewer (a little over 2,200 feet) would lie on County property along the right-of-way designated for the formerly proposed TC Interceptor. *See id.* at 617 (citing A.R., at 2194–98). The Plaintiffs expressed the view that the proposal by THG was merely the TC Interceptor in disguise, and they asked the Corps to look into the matter.[5] *See id.*

Unbeknownst to the Plaintiffs and the rest of the public, the Corps had decided,

perhaps as early as mid-November or early December 2001, that the County's revised project would be authorized under NWPs. *Crutchfield II*, 214 F.Supp.2d at 605–08; 638–41. On December 14, 2001, Ms. Painter conducted a site visit with County officials and memorialized her findings from that visit in an undated Site Visit Report, in which she noted that "it can be concluded that the magnitude of the proposed and completed impacts to wetlands and waters of the U.S. are minimal and could be authorized by general permits." *Id.* at 610 (quoting A.R., at 2674–77). The Corps' public notice calling for comments on the revised project, issued on December 11, 2001, made no mention of the fact that the Corps was considering NWPs as an alternative to the individual permit on which comment was solicited. Nor was a subsequent notice issued to reflect what the Corps was actively considering. Instead, the Corps first alerted the public of its intent on this point on April 4, 2002 when, as a *fait accompli*, the Corps authorized the project under four NWPs, and again avoided the need to assess certain environmental impacts. *See id.* at 618–19.

The Plaintiffs again challenged the Corps' decision to authorize the project under NWPs. In the August 7 Opinion, the Court found several aspects of the Corps' decision-making process to be arbitrary, capricious, and not in accordance with law, most notable of which were: (1) the determination that the County's JPA included all activities "reasonably related" to the project for which the permit was required;[6] (2) the Corps' decision to verify

---

**5.** The Corps granted this permit on April 30, 2002 and THG promptly commenced construction on its project. The THG permit is discussed more fully in the Memorandum Opinion this Court issued on October 31, 2002 in the related case of *Crutchfield v. Unit-*

*ed States Army Corps of Engineers, et al.,* Civil Action No. 3:02cv594.

**6.** As explained in *Crutchfield II*, there were several of the County's sewage transport plans that ought to have been, but were not, assessed (or were only given cursory atten-

that the County could proceed under the authority of NWPs, even though it had represented to the public that it intended to review the application as one for an individual permit and did not disclose its inclination to allow the project under NWPs; and (3) the Corps' decision that the County's JPA described a "single and complete project" in deciding whether to authorize the project under NWPs.[7] The matter was remanded to the Corps for reconsideration, this time with explicit instructions.

Having prevailed on the merits, the Plaintiffs moved for entry of an injunction as relief ancillary to the remedies of vacating the NWPs and remanding the matter for consideration by the Corps. As explained previously, much of the jurisdictional wetlands had been buried by construction of the WWTP before the decision in *Crutchfield I* and between the time that the November 2 Injunction in that case was vacated as no longer necessary on May 17, 2002 and the issuance of the August 7 Opinion in this case.

The Plaintiffs seek an injunction prohibiting the County from further construction of the WWTP at the site of the jurisdictional wetlands and at points on the construction site adjacent to, but not in, the jurisdictional wetlands. The Plaintiffs also ask that the injunction prohibit the County from allowing THG to continue construction of the 2,200 foot segment of the AC Sewer in the County-owned easement for the former TC Interceptor.

The requested injunction would not affect the forcemain that will carry treated effluent from the WWTP to the Pamunkey River because construction of that forcemain has been completed. Nor will the injunction affect the construction of the outfall/diffuser or the Lee Davis Pump Station and forcemain because the County has represented that it will not begin construction of those facilities unless the Corps issues permits for them. Thus, the injunction issue focuses on whether the County may continue construction of the WWTP, or allow THG to continue construction of the 2,200 feet of the AC Sewer lying in the County's right-of-way, while the Corps reconsiders the permits on remand.

The theory on which the Plaintiffs predicate their request for injunctive relief is that the continued construction of the WWTP pending remand will have " 'a direct and substantial probability of influencing [the Corps'] decision' " on remand. *Crutchfield I*, (November 2 Injunction Opinion), 192 F.Supp.2d at 459 (quoting *North Carolina v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir.1991)). That theory was discussed fully in the decision granting a similar injunction in *Crutchfield*

tion) for their reasonable relation to the revised project. One of those was the AC Sewer proposed by THG, but that was only one of several such projects which the Corps either ignored entirely or to which it gave legally inadequate attention.

7. The Corps' regulations respecting the issuance of NWPs, 33 C.F.R. §§ 330.6(c) and 330.2(i), dictate that "before the Corps may verify that a proponent may undertake certain activities under the authority of multiple NWPs, it must confirm that the activities involved constitute a 'single and complete project,' which means that those activities are

'the total project proposed or accomplished by one owner/developer or partnership or other association of owner/developers.' " *Crutchfield II*, 214 F.Supp.2d at 648. An additional regulation provides the applicable test for this inquiry, which requires the Corps to ask whether the project "would be constructed absent construction of other projects in the project area." 67 Fed.Reg.2020, 2094 (stating that "[p]ortions of a multi-phase project that depend upon other phases of the project do not have independent utility[,]" but that "[p]hases of a project that would be constructed even if other phases were not built" do have "independent utility.")

*I,* 192 F.Supp.2d at 455–463, and will be considered later here, as it applies to the facts in this record.

## DISCUSSION

Before assessing the merits of the Plaintiffs' request for injunctive relief, it is necessary to consider the County's argument that this Court does not have jurisdiction to entertain or grant such relief. The County's theory is that this Court was deprived of jurisdiction when the County filed a notice of appeal before the Plaintiffs moved for imposition of the injunctive relief that they had requested in their Complaint.

## I. EFFECT OF THE PENDING APPEAL ON THIS COURT'S JURISDICTION

The County posits that, when it filed its notice of appeal of the Order reflecting the August 7 Opinion, it effectively divested this Court of jurisdiction to entertain the request for permanent injunctive relief that had been first presented in the Complaint in this action, but had not been the topic of briefing or decision on the merits of the Plaintiffs' claims. The County bases this argument on selected language from the decision, *Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 890 (4th Cir.1999), wherein the United States Court of Appeals for the Fourth Circuit held that: "an appeal divests a trial court of jurisdiction over 'those aspects of the case involved in the appeal.'" (quoting *Griggs v. Provident Consumer Discount Company,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982)).

█ According to the County, the filing of the notice of appeal immediately divests a district court of jurisdiction over the case, subject to two limited exceptions. They are that a district court may take action "in aid of the appeal," *Fobian,* 164 F.3d at 890, or to maintain the status quo,

*see e.g., International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Eastern Air Lines, Inc.,* 847 F.2d 1014 (2d Cir.1988). The County argues that the requested injunction is a proceeding that fits into neither exception and, therefore, the motion for permanent injunctive relief falls under the general rule that a district court cannot act while the matter is on appeal. The County cites no authority for the application of the language in *Fobian* to a case, such as this, wherein the complaint asks for permanent injunctive relief if the plaintiffs prevail on the merits and the parties present the merits of the case for decision in their briefs, but do not raise issues respecting relief. Nor does the Court's independent research reveal any such authority. *Fobian* does not extend to foreclose consideration of the Plaintiffs' request for injunctive relief.

As the Plaintiffs note, the County's interpretation of *Fobian* ignores the last phrase of the quoted text which is the linchpin of the County's argument. The omitted text includes the qualifying explanation that: "an appeal divests a trial court of jurisdiction *over those aspects of the case involved in the appeal.*" 164 F.3d at 890 (emphasis added) (internal quotation marks omitted) (citing *Griggs,* 459 U.S. at 58, 103 S.Ct. 400). The text not quoted by the County makes clear that the purpose of the rule is to prevent a trial court and an appellate court from considering the same issues simultaneously.

That rather obvious proposition is explicated by Fourth Circuit precedent. *See In re Grand Jury Proceedings Under Seal,* 947 F.2d 1188, 1190 (4th Cir.1991) ("The rule is 'a judge-made doctrine designed to avoid the confusion and waste of time that might flow from putting the same issues before two courts at the same time.'") (quoting *In re Thorp,* 655 F.2d 997, 998 (9th Cir.1981)). Indeed, the desire to

avoid duplication of effort and conflict between the appellate court and the trial court are the factors that animate the Fourth Circuit's analysis in both *Fobian* and *In re Grand Jury Proceedings Under Seal*. Consequently, the rule of *Fobian* is not nearly as sweeping as the County suggests. Instead, the rule only applies to prevent a trial court from taking actions that might duplicate or confuse issues before the appellate court.

That certainly is not the case here because in considering the request for injunctive relief this Court will consider issues different, in procedure and substance, from those on appeal to the Fourth Circuit. The merits of the Corps' permitting decision are the only issues involved in the appeal because they are the issues decided in *Crutchfield II*, the decision from which the appeal was taken. In determining whether to grant the requested injunction, this Court is not called upon to, and need not, alter the August 7 Opinion in any way. Rather, the Court will consider the analytically distinct issue whether further construction will unduly influence the Corps in its reconsideration of the County's JPA on remand. A decision in this Court granting or denying injunctive relief, therefore, will not impede in any way the Fourth Circuit's consideration of the issues on appeal. Furthermore, the Plaintiffs' requested injunction is properly characterized as an injunction to preserve the status quo and thereby to preserve the jurisdiction of not only the Corps, but also the federal courts.[8] Accordingly, this Court retains jurisdiction to entertain the Plaintiffs' motion.

## II. PERMANENT INJUNCTION ANALYSIS.

In its November 2 Injunction Opinion in *Crutchfield I*, the Court spelled out fully the requirements for injunctive relief in cases such as this. *See* 192 F.Supp.2d at 455–66. As explained there, injunctions are not automatic remedies for violations of federal environmental laws, but rather "each case must be examined on its own facts and it is only when the record indicates a need for injunctive relief to remedy a violation ... or to achieve law's] purposes, that a court may issue an injunction." *Id.* at 455–56.

 The traditional test for determining the propriety of injunctive relief provides the analytical framework in such cases. Under that test, " 'permanent injunctive relief is appropriate where (i) there is no adequate remedy at law, (ii) the balance of the equities favors the moving party, and (iii) the public interest is served.' " *Id.* at 456 (quoting *Rambus v. Infineon Tech. AG*, 164 F.Supp.2d 743 (E.D.Va.2001)).

### A. Adequacy Of Legal Remedies

In the November 2 Injunction Opinion, the Court found that the legal remedy of remanding the matter to the Corps for reconsideration was inadequate because of the "substantial probability" that continued construction during remand would unduly influence the Corps' decision. The Plaintiffs' present motion for injunction invokes the principles of law explained in the earlier matter and a brief review of them is appropriate.

As it was in *Crutchfield I*, the Plaintiffs' core argument here is that their legal rem-

---

**8.** The County argues that the status quo is a project on which construction continues. The County is correct insofar as construction on the project is ongoing, but this observation misses the point. As the County itself admits, the vast majority of the wetlands on the WWTP site have already been filled. The County's fills, therefore, are offensive to federal law because the authorization for the fills is now a nullity. Construction on the project, therefore, has already upset the status quo ante.

edy, remand, is inadequate because of the "likelihood [that] [the County's] investment in and construction of [ ] the project will prejudice and foreclose any genuine consideration of alternatives [by the Corps or the courts]." 192 F.2d at 456 (internal quotation marks omitted).

The November 2 Injunction Opinion reviewed the relevant Fourth Circuit precedent on the subject and held that, in cases where a project proponent intends to continue construction in areas outside the jurisdiction of the regulatory body while the regulatory agency reconsiders authorization, an injunction halting work is appropriate only where the construction " 'has a direct and substantial probability of influencing [the regulatory body]'s decision.' " 192 F.Supp.2d at 459 (quoting North Carolina, 951 F.2d at 603). The November 2 Injunction Opinion identified a number of factors from North Carolina, and the earlier decisions of Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir.1972) and Maryland Conservation Council, Inc. v. Gilchrist, 808 F.2d 1039 (4th Cir.1986) that were potentially relevant to the inquiry. They are:

(1) the total financial cost of the project as compared to both the amount that has been spent thus far and the additional amount that the project proponent would spend pending agency review; (2) the percent of the project that has been completed before agency review begins as compared to the percent that would be completed if construction continued pending agency review; (3) the financial liabilities of the project proponent in the event that it is enjoined from continuing construction; (4) the amount of the project that is within the decisional jurisdiction of the regulatory body as compared to the project as a whole; (5) the public need sought to be addressed by the project under consideration and the applicable goals and deadlines within which the project proponents are operat-

ing; and (6) any indications from the regulatory body that bear upon whether it will be able to conduct its environmental review objectively.

192 F.Supp.2d at 459–60. These factors also guide the assessment of the request for injunctive relief now before the Court.

First, at the time of the November 2 Injunction Opinion the projected construction cost of the project was $33 million. Because the TC Interceptor was projected to cost $7 million, and the projected cost of the Lee Davis Pump Station and forcemain is $2.8 million, the total cost of the project, as revised, has declined by approximately $5.2 million (to approximately $27.2 million). Crutchfield I (November 2 Injunction Opinion), 192 F.Supp.2d at 460 and County Exhibit 1.

As previously noted, the discharge forcemain from the WWTP to the Pamunkey River has been completed for some time. The total estimated cost is $5.683 million of which $5.174 million has been paid or is due for payment. (Harksen Decl. at 3). No construction funds have been expended for the outfall/diffuser which has a projected cost of approximately $500,000. Nor have funds been expended for the Lee Davis Pump Station and forcemain, the cost of which is projected to be $2.8 million. Thus, as in Crutchfield I, the injunction issue reduces to whether further construction of the WWTP, clearly the largest component of the project, should be enjoined. At the time of the November 2 Injunction Opinion, the WWTP was 29% complete. Crutchfield I (November 2 Injunction Opinion), 192 F.Supp.2d at 460.

The County now contends that, in reality, on November 2, 2001, the WWTP was 58% complete and that the entire project was 52% complete. (County Exhibit 1.) It appears that the figures in that exhibit include work done after the evidence was submitted for the November 2 Injunction

Opinion, bills paid after the issuance of that opinion, and the cost of work completed after the issuance of that opinion that involved matters of safety and steps to protect equipment and partially completed structures from deterioration during the forthcoming injunction. Nonetheless, for purposes of today's case, the Court will accept the County's revised figures as set forth in County Exhibit 1 and consider that, as of November 2, 2001, the WWTP was 58% complete ($10.9 million expended or incurred out of a budgeted construction cost of $18.9 million). Relying on that exhibit, the Court also will consider the entire project to be 52% complete on November 2, 2001 ($16.1 million of costs expended or incurred against total budgeted construction costs of $30.8 million). The Court further relies on County Exhibit 1 to assess the current status of the project. According to Exhibit 1, the WWTP was 69% complete ($13.1 million in costs expended or incurred out of a total budgeted construction cost of $18.9 million) as of October 8, 2002. The entire project was 67% complete ($18.2 million of costs expended or incurred against a budgeted sum of $27.1 million) as of October 8, 2002.[9]

The County has represented, both to the Court and to the Plaintiffs, that if no injunction is issued it intends to "continue limited construction at the plant site by working to finish only those already partially completed facilities."[10] (Letter, Barbara M. Rose, Deputy County Attorney to

counsel for the Plaintiffs, dated September 10, 2002.) That assertion was repeated by counsel for the County at the most recent injunction hearing.

Second, it is estimated by the County that, as of July 31, 2003, the projected date for the Corps to render its decision on remand, the County will have completed 91% of the WWTP ($17.2 million expended or incurred as against $18.9 million total budgeted construction cost). That means that, by July 31, 2003, the overall project will be 83% complete ($22.4 million expended or incurred costs out of a total budgeted construction cost of $27.1 million). That is an increase from 69% of the WWTP and 67% of the entire project a year ago.

Third, the potential financial liabilities of the County in the event that it is enjoined from continuing construction at the WWTP has changed considerably from the last time this matter was before the Court. For example, in the November 2 Injunction Opinion, the County's liabilities in the event of an injunction were adjudged to be "rather uncertain." *Crutchfield I*, (November 2 Injunction Opinion), 192 F.Supp.2d at 460. In contrast, the record here contains proof that the County sustained costs in the amount of $2.2 million during the pendency of the previous injunction. Furthermore, the period of time estimated by the Corps to complete its review here is considerably longer than the time period the Corps anticipated for the remand in *Crutchfield I*. This lends

---

9. The County's injunction brief asserts that the plant (undefined) will be approximately 72% complete by October 8, 2002. That figure is inconsistent with County Exhibit 1, and it is uncertain whether the County's brief refers to the WWTP or to the project as a whole, although it appears to refer to the WWTP. The Court will use the more recent figures from the injunction hearing because they were verified under oath by Mr. Harksen, the County's Director of Utitilies.

10. "These facilities consist of the facilities for the middle stage of the plant processes such as secondary clarifiers, biological treatment facilities, RAS (return activated sludge) pump station, aerobic digesters and associated wiring and piping." (Letter, Barbara M. Rose, Deputy County Attorney to counsel for the Plaintiffs, dated September 10, 2002.)

extra credence to the County's articulated apprehension that its current contractor reasonably can be expected to terminate the construction contract rather than wait out the injunction pending remand. In that event, the County's procedures require solicitation of new bids, a process that the County estimates would delay completion of the project by 25 months.

Now, as in the past, the County's estimated costs associated with termination range from $3.8 million to $9 million. That range is so great and is sufficiently undocumented as to foreclose reliance on those figures as the demonstrated costs of contract termination. That said, however, it is virtually undisputed that the County will incur significant costs in the event of termination and that the costs may well be $3.8 million on top of other costs that have been incurred to date.

Fourth, the amount of the project that is within the decisional jurisdiction of the Corps is quite small as compared to the amount of the project as a whole. Of course, the amount under the Corps' jurisdiction will be significantly increased if, on remand, the Corps decides that the areas that the Plaintiffs contend should be under the Corps' jurisdiction are, in fact, under the Corps' jurisdiction.

Furthermore, this factor cannot be given dispositive weight, as the County seems to believe. That is because no matter what size the jurisdictional wetlands is, it is the existence of the jurisdictional wetlands in the project that confers jurisdiction over the Corps and that animates the Corps' obligation to comply with the law and with its own regulations. If the size of the jurisdictional area were to be considered controlling, as the County argues, compliance with the law by the regulators and the regulated (those applying for permits) would be at risk. And, as this very matter demonstrates, that risk is not insignificant.

Fifth, the public need that is sought to be addressed by the project under consideration and the applicable goals and deadlines within which the project's proponents are operating is a factor that, as the County argues, poses serious potential consequences to public sewage service. That is because, as found in *Crutchfield II*, 214 F.Supp.2d at 604, the County might well exceed its contract's limitations with Henrico County as early as late 2003 or early 2004.

Finally, the Court is required to consider indications from the regulatory body that bear upon whether it will be able to conduct its environmental review objectively. The entire history of this project raises serious questions about whether the Corps can conduct its environmental review here objectively.

As explained in *Crutchfield I* and *Crutchfield II*, the Corps, throughout this process, has not acquitted itself well at all. Indeed, it is the conduct of the Corps that calls into serious question the adequacy of the Plaintiffs' legal remedy. Twice the Corps has had an opportunity to comply with its regulations and to give the Plaintiffs' objections and the record a meaningful review. Twice, it has failed to discharge those obligations.

So lacking in reliability has the Corps' conduct been to date that the Court took the unusual step of requiring some other district office conduct the remand ordered in this case. The Corps apparently has taken that to heart and has referred this matter to the Baltimore district office where it is now being considered. And, as the Court understands the statements of the Corps' lawyers, that is where the decision will be made.

Taken as a whole, these six factors suggest that the Plaintiffs' legal remedy is inadequate unless the Court can say with confidence that the Corps will do its duty and abide by the law and by its own

regulations. The Corps' response to the August 7 Opinion, and the explicit instructions contained in that decision lead the Court to believe that the remand can be objectively conducted by the Baltimore office. The Corps responded to the criticisms levied at it in the Crutchfield II opinion by transferring the consideration on remand to another district office.[11] Further, the rather explicit directions contained in Crutchfield II no doubt will help focus the Corps' examination of the record in a careful and thoughtful way and enable it to articulate thoughtful, documented findings (rather than conclusory generalizations presented in a uncritical way) on the issues in dispute. Accordingly, the Court is of the opinion that the legal remedy of remand is adequate, albeit barely so. That said, the Court confesses that a reasonable jurist could reach the opposite conclusion.

### B. Balance Of The Equities

In *Crutchfield I,* the Court found that the County had encouraged the Corps to authorize the project under NWPs, in spite of the fact that it knew "that verification of the NWPs rested on shaky ground." 192 F.Supp.2d at 463. Accordingly, "the County's attempt to wrap itself in equity's cloak [was] not persuasive." *Id.* But for the County's own aggressive and obstinate tactics in pursuing the Corps' authorization, the County would not have been facing the possibility that the project would be enjoined. The County's own actions, therefore, attenuated any inequity to the County that might result from granting the injunction. In contrast, the Plaintiffs faced the substantial probability that ongo-ing work would unduly influence the Corps' decision and thereby would deny them the protection of federal environmental laws. The balance of the equities, therefore, tipped decidedly in the Plaintiffs' favor. *See id.*

In this action, the Plaintiffs point to the almost identical harm that would befall them should an injunction not issue. Indeed, notwithstanding the Court's conclusion in part IIA above, the progress on the project since the injunction was lifted in May poses a serious risk that this harm might be more likely than it was a year ago.

The County, in turn, asserts that it stands to suffer three potential injuries should the Court issue the injunction: (1) the loss of approximately $1.7 million in costs associated with project shutdown;[12] (2) the amount of stand-by costs associated with an injunction and the probability that the County's general contractor on the project will terminate its contract with the County; and (3) the hindrance of the County's efforts to meet its citizens' ever-increasing need for wastewater capacity, especially once the present drought subsides.

The estimated shut-down and stand-by costs are certainly reasonable in perspective of the actual costs the County actually incurred as a result of the previous injunction. With the benefit of experience, the County's projection of $200,000 per month in stand-by costs is not speculative, as it was this time last year.

The estimated costs to the County increase substantially should the County's general contractor terminate the contract.

---

11. Of course, the Corps also noted an appeal from the August 7 Opinion but that cannot be counted against the Corps for it is entitled to appeal decisions with which it disagrees.

12. The County estimates it would incur $10,000 in demobilization costs, $10,000 in remobilization costs, and $1,657,500 in stand-by costs—*i.e.,* the cost of keeping the Contractor on-site to perform erosion and sediment control, site security, and equipment maintenance.

According to Mr. Harksen, the general contractor has the power to terminate the contract 90 days after a work stoppage order. Since the Corps has estimated that review on remand will take 250 days, it is more likely that an injunction will eventually trigger the contractor's termination rights. Should the general contractor elect to terminate during the Corps' review period, the County contends that it stands to lose anywhere from $3.8 million to as much as $9 million. Although these costs are potentially quite high, they are very indefinite and not well-documented. Nonetheless, given the length of time the Corps has projected for its reconsideration on remand (250 days), the likelihood of termination looms far greater and more certain than was the case last year, and the cost to the County of such termination will be substantial.

Finally, the County points to the wastewater treatment capacity crunch that is the genesis of its project. As the Court noted in *Crutchfield II*, 214 F.Supp.2d at 604, the County might reach capacity under the contract with Henrico County as early as late 2003 or early 2004. The County does not believe this will actually happen, but nevertheless believes it prudent to have the WWTP on-line before the 2004 wet weather season. Should the Court grant the injunction, the County faces a delay of 250 days at a minimum. Should the general contractor terminate the contract (however likely that may be), would be delayed by 25 months.

The Plaintiffs sharply dispute the significance of these potential costs. First, they urge the Court to find that here, as in *Crutchfield I*, the County is not an innocent party. Any costs the County incurs, argue the Plaintiffs, are attributable to the County's aggressive, high-pressure tactics in seeking the permit. Furthermore, they note that the County premises its explication of potential harms on the assumption that the Corps will authorize the project.[13] The Plaintiffs' contention all along has been that the Corps should not authorize the project. The Plaintiffs contend that, if the Corps does not authorize the project, the County might save money by abandoning the WWTP in favor of other less-expensive alternatives.

The parties, therefore, present the Court a balance of equities analysis that resembles the one the Court faced a year ago, with some notable differences. First, the County's potential stand-by costs are no longer speculative. Having endured the previous injunction, the County is quite able to quantify the expected cost. Second, although on November 9, 2001, the County preserved its legal rights by telling the Corps that the revised project ought to be permitted under NWPs, the County did not urge the Corps to switch course midstream and consider the project under NWPs. Indeed, there is no evidence that the County was involved, in any way, in the Corps' improper conduct in that regard. Whereas the County could not equitably rely on costs attributable to its own wrongdoing in *Crutchfield I*, the County is not so burdened here.

In sum, the balance of the equities is almost in equipoise.[14] The Plain-

---

13. The Plaintiffs argue that the opposite assumption should hold true because the project is not "water dependent." The Plaintiffs derive this argument from the various regulations governing the issuance of Corps permits for the discharge of fill material into wetlands. While the Court acknowledges that authorization is not a foregone conclusion,

whatever presumptions that may apply in the process of determining whether to grant the County's permit are not before the Court. The Court, therefore, remains neutral as to whether the project will ultimately proceed as the County intends.

14. Of course, the Plaintiffs seek to extend any injunction to prohibit the County from allow-

tiffs' rights have been violated yet again by the Corps and they face a risk that the Corps may be so invested in vindicating its most recent decision that the amount of work to be done on the WWTP during remand will be enough to push the Corps to yet another irrational, uncritical, inadequately explained decision. However, this time around, the County is not responsible for the Corps' flawed decisional process or for the Corps' flawed decisions.

Furthermore, the record in this case, unlike the one in *Crutchfield I*, is not utterly devoid of facts which might allow a reasoned, supported permitting decision. That is not to say that there is (or is not) substantial evidence to support either an individual permit or NWPs. Indeed, the Court cannot possibly make that assessment at this time. But, there is evidence in the record that, although perhaps requiring augmentation before it could supply the basis for a factually supportable and clearly articulated decision, points to the possibility of a supportable decision. That simply was not true of the record made in *Crutchfield I*.

## C. Public Interest

In *Crutchfield I*, the Court found that the public interest favored the injunction. Although the Court acknowledged the public interest in accommodating long-term growth by providing sufficient wastewater capacity, the public's interest in "ensuring that federal regulators ... make their decisions as objectively as possible" was a stronger countervailing interest. 192 F.Supp.2d at 465. That conclusion was possible because the County did not face an imminent wastewater treatment capacity shortfall. Accordingly, the delay in meeting wastewater capacity needs would not "adversely affect the public interest in so great a way as to foreclose issuance of the kind of relief that will effectuate the environmental statutes that are involved here." *Id.* In the present action, the Plaintiffs urge the Court to follow this reasoning.

■ The County, in turn, argues that circumstances have changed such that an injunction is not necessary to effectuate objective review. Specifically, the County points to the Court's August 7, 2002 Order and subsequent promises by the Corps. With a new district office considering the matter armed with explicit instructions, argues the County, objective review is much more likely this time. The County argues further that its need for additional wastewater treatment capacity has become more pressing. And, the decision on the merits finds that the County is much closer to exceeding present capacity than it was a year ago. *Crutchfield II*, 214 F.Supp.2d at 604. It is possible, subject to

---

ing THG to construct that portion of the AC Sewer that lies in the right-of-way previously designated for the TC Interceptor. The balance of equities between the Plaintiffs and THG tips decidedly in favor of THG.

The Court allowed THG to appear in this action to defend its interest in completing the AC Sewer. At the hearing held on October 24–25, 2002, THG presented evidence respecting the costs it has incurred since it received the permit and the costs it anticipates should the Court issue the requested injunction. This evidence reveals that THG has spent approximately $4 million since the Corps issued the permit. Furthermore, THG

has sold parcels to commercial and residential customers, all of whom expect their property to be served by sanitary sewer service within the next few months.

The evidence also reveals that the requested injunction, if issued, will seriously upset the project's financing. Specifically, THG has arranged an issue of bonds that it expects to generate as much as $19 in revenue for the project at favorable interest rates. Should the proposed injunction issue, THG's underwriter will withdraw its support for the bond issue. Without the bond revenue, it is highly doubtful that the THG project can proceed.

the vagaries of weather, that the County will exceed its capacity limits at the Henrico County facility in late 2003 or early 2004. Further, the County faces a realistic risk of an added 25 month delay in completing the project (assuming the Corps issues permits) if an injunction is granted. And, the potential costs should the contractor terminate rather than wait out the injunction are significant. This record, unlike the one in *Crutchfield II,* reflects a public interest analysis that counsels against, rather than for, the issuance of an injunction.

## CONCLUSION

For the foregoing reasons, and notwithstanding the Corps' past conduct, the record does not clearly call for the imposition of injunctive relief. Because the drastic remedy of injunction should not be imposed unless it is shown to be necessary, because the Corps has taken the decisional process out of the hands of those who have twice acted arbitrarily, capriciously and not in accord with law, because the balance of the equities is in equipoise and because the public interest counsel against injunction, no injunction will be issued. Under that circumstance, it is not appropriate to enjoin the County from allowing THG to proceed with construction of the AC Sewer. That is especially true given that the Plaintiffs' action against THG is being dismissed. Accordingly, the Plaintiffs' Motion For Injunction is denied without prejudice.

Of course, if the Corps' conduct during the proceedings on remand should disclose the presence of influence by virtue of the ongoing work at the WWTP, or should reflect any other reason for injunction, or, if the County deviates from the representations it has made about the limited scope of work it will undertake during remand or about the facets of the project in which no work will be done, the Plaintiffs' are at liberty to renew their request for injunctive relief.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.